## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| Jane Doe, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | CIVIL CAUSE NO. _____ |
| v. | § | |
| | § | **JURY DEMANDED** |
| The University of Evansville, | § | |
| | § | |
| *Defendant* | § | |

---

### PLAINTIFFS' ORIGINAL COMPLAINT & JURY DEMAND

---

Plaintiff Jane Doe ("Plaintiff") files this Original Complaint and Jury Demand complaining of Defendant the University of Evansville (the "University"). In support thereof, Plaintiff would show the Court as follows:

## I.
## PARTIES

1.      Plaintiff Jane Doe is an individual who, at the time of the sexual assault complained of herein, was a student attending the University of Evansville.

2.      Defendant the University of Evansville is a private educational institution with its campus located in Evansville, Vanderburgh County, Indiana. The University of Evansville may be served with process through its registered agent.

## II.
## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since Defendant resides or resided in this district and the events or omissions giving rise to the claim occurred in this district.

5.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

6.      Plaintiff brings this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein. This action is brought pursuant to 42 U.S.C. § 1983 and § 1988, and the Fourth Amendment to the United States Constitution, made applicable to Defendants through the Fourteenth Amendment to the United States Constitution.

7.      The University of Evansville is an educational institution that, at all relevant times, received federal funding for its academic programs and activities and was subject to the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

8.      Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law including breach of contract and negligence.

### III.
### TITLE IX AND INDIANA LAW PROTECT STUDENTS LIKE JANE DOE

9.      Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 168l(a), states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

10.     Implemented through the Code of Federal Regulations (*See* 34 C.F.R. § 106.1), Title IX provides: "A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part." 34 C.F.R. § 106.8(b).

11.     In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of discrimination.

12.     In *Davis v. Monroe County Board. of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is: (a) "deliberately indifferent to sexual harassment of which the recipient has actual knowledge" and (b) "the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 1669–76.

13.     Title IX jurisprudence as well as Department of Education regulations have long recognized that a single event of sexual assault constitutes harassment so severe, pervasive, and

objectively offensive that it deprives its victims of access to the educational opportunities provided by the school.  That is because "[t]he more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment." U.S. DEPT. OF EDUC. OFFICE OF CIVIL RIGHTS, *"Dear Colleague" Letter* (April 4, 2011).

14.     Indiana law also provides protections for students and requires the University to exercise reasonable care toward students. *LaPorte Cmty. Sch. Corp. v. Rosales*, 963 N.E.2d 520 (Ind. 2012). The Indiana Supreme Court has also held that "the common law duty of care that a school owes its students is not dependent upon whether an injury a student suffers occurs on school property." *Doe v. Lafayette Sch. Corp.*, 846 N.E.2d 691, 699 (Ind. Ct. App. 2006) (citing *Mangold ex rel. Mangold v. Indiana Dept. of Natural Resources*, 756 N.E.2d 970, 973 (Ind. 2001)).

15.     Ultimately, as illustrated below, the circumstances giving rise to the claims of this Plaintiff, and others, demonstrate a history of student harassment and assault resulting from deliberate indifference that the Defendant University has allowed to continue for years.

### III.
### BACKGROUND FACTS

**A.     Jane Doe attended the University, which hired McCarty to coach Men's Basketball.**

16.     Plaintiff Jane Doe was a student at the University studying Athletic Training from August 2016 until May 2020. Because her Athletic Training major required clinical learning, in her Junior year, Jane Doe applied to and was selected as a Student Athletic Trainer for the Men's

Basketball Team. As an Athletic Training Student, Doe was earning course credits and gaining hands-on experience to become an athletic trainer.

17.    In March 2018, the University hired former NBA player Walter McCarty ("McCarty") to be the Head Coach for the Men's Basketball program. McCarty, a married father of two, played college basketball at the University Kentucky before spending ten years playing professionally for the Boston Celtics. Afterward, he went on work as an assistance coach for three years at the University of Louisville before spending seven years as an assistant coach for the Boston Celtics and Indiana Pacers. As the "face of the program," McCarty's role as head coach included fundraising, recruiting, and community involvement. His respect in the community and at the University was bolstered by the fact that McCarty himself was raised in Evansville and, when interviewed, fondly recalled that he "used to pass the [U]niversity every day" in his youth.[1]

18.    Within just three months of hiring McCarty, the University learned that McCarty's behavior towards women was sexually inappropriate—behavior that the University knew escalated continually throughout his employment. Between June 2018 and November 2019, the University received at least seven reports or complaints that McCarty had acted sexually inappropriately with women who were students and employees of the University and women in the Evansville community.

19.    But Jane Doe was unaware of these allegations before she began working for the team McCarty coached. Until then, she viewed McCarty's arrival as a welcomed change to the Men's Basketball program. News outlets reported that "[w]hen McCarty was hired in March 2018, Evansville immediately felt his presence." *Id.* Attendance at games had significantly increased, and McCarty was known and liked in the community. In fact, "the cachet of his NBA experience

---

[1] Harry Lyles Jr., *Walter McCarty has put Evansville back on the map*, SBNATION.COM (Nov 18, 2019, 11:30a.m.), https://www.sbnation.com/2019/11/18/20964325/walter-mccarty-evansville-basketball-coach-kentucky-upset?via.

helped on the recruiting trail" going into his second year coaching.[2] Then on November 12, 2019—just weeks before Doe was assaulted—McCarty led the team to a historic upset over the first-ranked team in the nation, his alma mater the University of Kentucky, despite that Evansville was the 25-point underdog: "The Evansville Aces, under former Kentucky national champion Walter McCarty, have gone into Lexington and beat the Wildcats on their home court."[3] The win and increasing national success led many to declare that McCarty "put Evansville back on the map." *Id.*

**B.     Soon after meeting Doe, McCarty begins acting sexually inappropriate with Doe, culminating in harassing her and sexually assaulting Doe**

20.     After meeting McCarty in March 2019, Jane Doe began working under McCarty in April 2019. Jane Doe had worked with other teams, like the baseball team, and would not have direct communication with the coach. In comparison, however, McCarty was with more engaging with students involved in the Men's Basketball Program. When coaching the team, Doe said, McCarty initially had nice manners and was respectful. She described how, before or during practice, McCarty would walk over to the athletic training students, do a special handshake and engage in small talk. Over time, this made Doe comfortable with him.

21.     Soon after they met, McCarty initiated communications with Jane Doe on April 18, 2019. Over the following months, McCarty sent Doe numerous messages via Instagram, Snapchat, and telephone text in which he made comments that were inappropriate and sexually harassing, including asking her to get drinks with him. Doe says she was naïve in how she viewed his communications leading up to the assault, thinking "oh that's really cool to be able to talk to coach,

---

[2] Des Bieler, *No. 1 Kentucky stunned by Evansville and its coach, ex-Wildcat Walter McCarty*, WASHINGTONPOST.COM (Nov. 12, 2019, 11:52 a.m.), *available at* https://www.washingtonpost.com/sports/2019/11/13/no-kentucky-stunned-by-evansville-its-coach-ex-wildcat-walter-mccarty/.
[3] *See* Lyles, *supra*, note 1.

or to talk to someone who has such an impact. . . . fans want to talk [to] him." Doe felt compelled to respond to McCarty's messages because he was known and liked in the community and in an authority position over her as the Head Coach. In those communications, Doe always addressed McCarty as "Coach," consistent with his superior relationship over her, both as a prominent staff member at the University where Doe was a student and as Head Coach of the team where she was a Student Athletic Trainer.

22.     McCarty also made comments about Jane Doe's body in conversations with her, as well as in public conversations at practices and games, remarking to Doe's colleagues, superiors, basketball team members, and fellow students that Doe had "pretty feet."

23.     These communications were a preamble to what culminated in McCarty sexually assaulting Jane Doe on December 9, 2019. That day, while Jane Doe was taking and studying for final exams, McCarty messaged her throughout the day via Snapchat, persistently asking her to meet up with him:

| | |
|---|---|
| McCarty: | "I'm gonna kidnap you one of these times lol have u come hang with me" |
| . . . | |
| | "You should have come hang out with me." |
| Jane Doe: | "Tonight?" |
| McCarty: | "Yes" |
| Jane Doe: | "Well ya shoulda told me earlier! I told some friends I'd hang out" |
| McCarty: | "So come after u hang out with your friends" |
| Jane Doe: | "Wat we gonna do" |
| McCarty: | "What you wanna do" |
| . . . | |
| | "You coming out lol" |
| . . . | |

| Jane Doe: | "Id love to hang out coach, but don't rly want ppl getting the wrong impression me showing up there at 12 am." |
| McCarty: | "Who is gonna know your showing up here?" |
| Jane Doe: | "Well my roomie prob gonna call me when she gets back and I'm not there lol" |
| McCarty: | "Tell her your at the library or something lol |
| | No it's not I wouldn't do that as much as I like looking at your booty lol |
| | Come" |
| Jane Doe: | "Ur persistent ya know lol" |
| . . . | |
| McCarty: | "I am persistent but you like that. . . ." |
| Jane Doe: | ". . . I just am not so sure about this so late" |
| McCarty: | "Just come" |

Feeling pressured, while out picking up fast food, Jane Doe agreed to eat her food at McCarty's house for five minutes:

| Jane Doe: | "U still want me to come? I can't stay but 5 min" |
| McCarty: | "Yes That's fine" |
| Jane Doe: | "Bc friend is already on way back to our duplex" |
| McCarty: | "Just come" |

Around midnight, she texted her roommate to ask for help in advance: "Hey if I txt u, call now, please do it. I'll explain later." After picking up food, Doe reluctantly drove to McCarty's house. Expecting that McCarty had roommates or other people would be at the house, Doe found it strange that McCarty was alone when she arrived and reiterated that she was just going to eat and leave. After Doe texted her roommate that she was about to call, the roommate called Doe around 12:30

8

a.m. and Doe took that as an opportunity to tell McCarty it was time for her to leave. But McCarty

cajoled her to stay to watch a show for a bit.

24.     Suddenly, McCarty reached over and grabbed her thigh; Jane Doe froze. As

McCarty's unwelcome advances turned physical, Jane Doe (who is only 5'1" tall) thought "I don't

want to run. He's 6'9 and I'm not going to . . . I don't want to be raped right now." What followed

was a blur to Jane Doe. But it is undisputed that McCarty touched Jane Doe's breasts and buttocks,

and digitally penetrated her. The formal investigation by the University into the incident concluded

that "it is more likely than not" that the sexual contact and sexual intercourse happened as Doe

says it did. Further, the acts McCarty perpetrated were "all without [Jane Doe]'s consent."

25.     After Doe returned to her residence five or six minutes later, her roommate saw

Doe remaining silent and asked, "What's wrong?" Jane Doe immediately told her roommate that

McCarty had taken advantage of her and touched her very inappropriately. After opening up to her

roommate, "most of it was tears. Not words." The next day, Doe also told two other close friends

about the assault so that they could stay with her once her roommate left town that day.

26.     From December 10 through 12, 2019, McCarty continued sending Jane Doe

unwelcome sexual advances. In response, Jane Doe attempted to confront McCarty about what

happened:

| | |
|---|---|
| Jane Doe: | "U lied to<br>Me<br>Don't ever expect a visit from me again" |
| McCarty:<br>. . . | "Are u serious, it really wasn't a booty call<br>Sorry you feel that way" [Confused or Slightly Frowning Face emoji] |
| <br>. . . | "I've been thinking about my lil friend all night<br>And all this morning<br>I'm so sorry, I told u you are trouble for me" |

> "How's my friend today
> [Weary Face emoji] what's wrong"

Jane Doe:     "Why did u do what u did to me

. . .

> I told u I wanted to stop and u kept goin"

27.     In connection with the incident, Jane Doe sought counseling from an on-campus counselor on December 12, 2019, the morning after Doe's last final exam. After speaking to a counselor, Jane Doe filed an anonymous report online with the University through Crime Stoppers that same day.

28.     As a result of the assault—as well as having to see McCarty afterward, suffering from nightmares, and participating in the months-long investigation—Jane Doe's ability to perform academically suffered for the first time in her college career. The assault happened in the middle of final exams, and her difficulties studying and concentrating during the remaining exams diminished her performance at the end of the fall semester. Immediately following the incident, Jane Doe had difficulty giving full effort to her remaining final; her mind "wasn't fully there or motivated" towards her academics and, she struggled navigating her student athletic training assignment as she tried to fulfil her duties and avoid seeing McCarty. In carrying out her role as an athletic trainer, Jane Doe had to see McCarty for weeks at basketball games and practices, even though the basketball gym was "the last place [she] wanted to be." McCarty remained on campus as Jane Doe's superior until December 26, 2019.

29.     In the spring semester, even after McCarty was fired, the investigation continued, and Jane Doe struggled to stay focused, moved slower in digesting reading materials, and had trouble understanding her own notes. Due to difficulty dealing with her academics and the demands of the reporting and investigation process, Jane Doe fell behind in her classes. Between

January and February 2020, she requested numerous academic allowances because she was having a hard academically and struggled to focus and complete assignments.

30. Jane Doe also reported having nightmares. Her roommates, friends, and supervisor at the University all confirmed that Doe was not herself for some time after the incident.

31. The impact of the assault has resonated beyond Jane Doe's academic and social life, however, as she has been diagnosed with post-traumatic stress disorder ("PTSD").

**C.    The University actually knew of Walter McCarty's insidious pattern of sexually harassing and assaulting female students and employees—but did nothing to stop it.**

32. Despite having had notice of a well-documented pattern of sexual misconduct, the University did nothing meaningful to protect employees and students of the University from McCarty's predatory behavior before Jane Doe was sexually harassed and sexually assaulted. Apart from warning McCarty on only three occasions that University policies prohibited such sexually improper conduct, there is no record the University followed up, monitored, or supervised McCarty afterward to ensure McCarty was heeding those warnings. This case arises from McCarty's sexual harassment and assault—sex-based discrimination—of Jane Doe, following the University's deliberately indifferent response to multiple events of McCarty's sexual harassment of other women.

33. The University's failure to promptly and appropriately investigate and respond to McCarty's prior sexual harassment allowed a condition to be created that substantially increased the chances that Jane Doe and others would be sexually harassed and assaulted. Moreover, the University's failure to promptly and appropriately investigate and respond to these harassment and assault furthered sexual harassment and a hostile environment, effectively denying Jane Doe, and

other female students, access to educational opportunities. Plaintiff brings this action to redress a hostile educational environment pursuant to Title IX.

34.     During Walter McCarty's brief tenure as head coach from March 1, 2018, until his termination on January 21, 2020, a timeline of numerous incidents shows a pattern of misconduct with women on and off the university campus, leading to the assault and harassment of Jane Doe. The University knew within about three months after hiring McCarty that his behavior towards women tended to be sexually inappropriate—behavior that the University knew escalated continually throughout his employment. But the University took virtually no meaningful action regarding any of the following incidents:

- ***As of June 6, 2018***, the University knew McCarty had acted inappropriately with a woman at a local restaurant.

*Report*: Director of Athletics Mark Spencer received the information from a University Board member. On June 6, 2018, Spencer met with McCarty and explained the University's behavioral expectations of its employees.

*Action*: Beyond the ten-minute meeting, a verbal warning was the only action taken.

- ***The University learned in July 2018*** that McCarty had been sending persistent and unwanted text messages and private Instagram messages to a University employee, inviting her to bars, restaurants, and his home.

*Report*: A University alumnus told the school's administration about McCarty's interactions with the employee, who worked in the Athletic Department and reported to then Title IX Director Dr. Tracy Folden and said his conduct toward the employee even made the alumnus uncomfortable.

*Action*: University President Christopher Pietruszkiewicz reviewed facts of the case and determined that the incident did not support a policy violation. On September 27, 2018, Dr. Folden sent McCarty a letter that simply summarized the investigation and the University sexual harassment policy and advised him not to communicate with the employee in any way and to use caution when engaging with employees.

- ***Again in September 2018, the University learned*** that McCarty sent a female University student text messages that were unwelcome and harassing.

*Report*: The student, accompanied by her mother, reported McCarty's conduct to Dean of Students Dana Clayton and asked that the messaging stop.

*Action*: Although Dr. Folden and Mr. Gehlhausen determined the messages did not violate University policy, they notified McCarty not to have any other further communication with the student and again advised him to be more cautious in his interactions with the campus community.

- ***The University was informed multiple times from Fall 2018 through Summer 2019*** that McCarty routinely sent a female employee in the athletic department inappropriate private Instagram messages inviting her to have dinner and attend events with him—and even asking to see a photo of her wearing a swimsuit.

*Reports*: Throughout this period, the athletic department employee told her superior and another University employee about McCarty's conduct and her discomfort with the messages from McCarty.

*Action*: No apparent action was taken by the University based on McCarty's behavior toward the female athletic department employee.

- ***Yet again in June 2019, the University learned*** that McCarty sent a former student private Instagram messages that made her uncomfortable.

*Report*: The woman reported McCarty's conduct to University Vice President of Student Affairs and Dean of Students Dana Clayton. The student met with Mr. Gehlhausen and said she had spoken to several other students who had similar encounters with McCarty. The student said her reason for coming forward was so that the University would be aware of the incident if other students came forward.

*Action*: The Office of Institutional Equity simply created a case file of the complaint and no further action appears to have been taken to address the behaviors with McCarty.

- ***The month before the assault on Jane Doe, the University was told on November 5, 2019*** that McCarty had for weeks been giving uncomfortable attention to a female student who worked in the University Center Café court, initiating unwanted physical contact in a lingering way that was unwanted by the student.

*Report*: The student reported McCarty's conduct to Title IX Coordinator Annie Sills and told Mrs. Sills she also knew of five or six other female students who had similar experiences with McCarty.

*Action*:  Mrs. Sills contacted the other student named by the reporting student, but did not receive a response from the other student. The University again created a case file, but took no further action.

- ***Then on December 11, 2019, two high-ranking University employees raised concerns*** about McCarty's alleged behavior with others in the University community—two days after McCarty's sexual assault of Jane Doe but one day before she anonymously reported the assault.

*Action*:  Annie Sills contacted both employees and they said others had reported to them that McCarty engaged in inappropriate conduct, pointing to McCarty's behavior toward young

women at a local bar and to his relentless pursuit of a female student at the University. No further action was taken.

35.     In short, nearly every month after the first documented instance of McCarty's sexual harassment, he harassed or assaulted another woman in violation of school policy and federal law. And, despite University officials' initial determinations that McCarty did not violate school policy by messaging and engaging with these women in a way that was uncomfortable to them and unwanted, his conduct appears to violate the *Equal Employment, Discrimination, Harassment, and Related Laws and Regulations* provision of the Employee Code of Conduct, which states: "Harassment of any kind is unacceptable at the University of Evansville and is in conflict with the policies and interests of the institution." Even if it is not sexual in nature, the Code of Conduct prohibits non-sexual harassment, namely "nonverbal or physical conduct which has the intent or effect of unreasonably interfering with the individual's or group's educational and/or work performance, or creating an intimidating, hostile, or offensive educational and work environment on or off campus." McCarty's continual unwelcome communications and attention paid to women in the Evansville community—and his extramarital sexual contact with them— further violates the Code of Conduct's *Commitment to Integrity and Ethical Conduct*, as even Spencer suggested.

36.     Indeed, the Title IX investigation into Doe's complaint concluded that McCarty's "pattern and practice of communicating through social media and/or in person in a manner that made other females feel 'uncomfortable'" supported violations of the University's *Sexual Harassment and Misconduct Policy*. Plainly apparent from these facts is that the University had actual notice of a persistent pattern of sexual harassment and assault perpetrated by Walter McCarty.

37.     But rather than take any meaningful action to protect women—including students and employees of the University and those in the Evansville community—from McCarty's predatory behavior, the University chose to proceed with deliberate indifference to the near certainty McCarty's unlawful behavior would continue.

### D.     More victims of McCarty's predatory behavior come forward after Jane Doe told the University about being harassed and assaulted by McCarty.

38.     As a result of Jane Doe's decision to pursue her complaint against McCarty, at least two additional women came forward to report his sexually inappropriate behavior with them on numerous occasions while they were students at the University:

- *In June or July 2018*, a female student working in the Athletic Department when, after learning that the female student and her boyfriend (a fellow student athlete) had broken up, McCarty began messaging her on Instagram. That summer, they had intercourse which, though consensual, the female student says happened because "it was really easy to fall into a trap of . . . someone who is super powerful, or [had] a title on campus" at a time when she was "young and immature."

- *In August 2018*, after the female student spent the night drinking at a fraternity party and then on campus, McCarty "completely random[ly]" sent her a message and picked her up from campus. McCarty took her back to his house, where the female student says that "before anything happened I did tell him this is not right" and, though she did not tell him "No," she "said this does not feel right." Nevertheless, "then we had vaginal intercourse."

- *And in January and April–May 2019*, a female student athlete met McCarty when he saw her in the University gym facility and told her she had good form. In April 2019, McCarty saw the female student athlete running on campus, stopped his car in the middle of the road, and told her he could tell she liked to work out before asking to follow her on Instagram. After allowing

him to follow her, in May 2019, McCarty "liked" a photo of the female student athlete in spandex and messaged her privately that evening.

### E. The aftermath and external investigation into Jane Doe's sexual assault.

39.     On or about December 12, 2019, Jane Doe anonymously submitted a report to the University's Title IX Office notifying the office of an assault by McCarty.  On or about December 19, 2019 the University was able to confirm through interviews of individuals in the athletic department that the complainant was Jane Doe. Then on December 20, 2019, Jane Doe met with Annie Sills, Institutional Equity and Title IX Coordinator and reported the sexual assault to the University.

40.     Athletic Director Mark Spencer met with McCarty on December 26, 2019 to tell him he had the choice to resign or be placed on administrative leave. McCarty thought neither course of action was necessary, as it was "only one incident." While Spencer agreed neither option was a good one, he said had to act because, despite McCarty's claim, "there was a timeline of multiple incidents showing a pattern leading to" Jane Doe's allegation. Furthermore, Spencer told McCarty that even the sexual communications and contact he admitted having with Jane Doe would warrant termination. Given McCarty's extensive pattern of sexual harassment, the University should have implemented measures to protect the numerous women McCarty harassed or assaulted.

41.     Even while admitting that significant information evidencing this pattern had been presented to the University—and that McCarty had been warned or cautioned about his improper behavior numerous times—Spencer was apologetic to McCarty that they could not just put aside Jane Doe's allegations to let McCarty resign under the guise of wanting to spend time with his family, rather than admit to any wrongdoing. Spencer even commiserated with McCarty and said

that he wished McCarty did not have to resign or be terminated, stating that "this is the age of MeToo" and that the University was "hypersensitive to these types of offenses and just cannot let him off with a warning, especially since he does have a history of previous complaints," and especially given the recent firing of theater professor R. Scott Lank for sexual misconduct.

42.     Despite being confronted with a clear pattern of misconduct, McCarty never acknowledged the severity of his behavior or the likelihood he would experience any consequences. For instance, Spencer said that when asked what McCarty said in response to allegations raised the June 6, 2018 meeting, McCarty "was very dismissive that this was going to lead to anything."

43.     On December 30, 2019, Jane Doe was then formally interviewed by the University. This interview was a very painful interview lasting around 5 hours where Jane Doe shared copies of messages sent to her by McCarty with the University. On December 26, 2019, the University hired external investigators of the Philadelphia based office of the law firm of Cozen O'Connor. Over a two-month period from December 30, 2019 to February 21, 2020, the external investigators interviewed Jane Doe numerous times as part of the independent investigation into the assault and harassment.

44.     During the investigation, the University ordered McCarty on at least four occasions not to delete or destroy any communications, logs, documents, or photos. But McCarty ignored these orders, deleting at least 509 emails from his University account from December 13, 2019 through January 17, 2019. Likewise, when McCarty returned his University-issued laptop after being terminated, the laptop had been "wiped clean." The investigation concluded that "[t]he volume of 509 deleted emails over a total number of 32 separate days suggests that [McCarty]'s acts of deleting and purging (permanently destroying) communications were intentional," in

violation of orders not to delete or destroy evidence and not to interfere with the integrity of the investigation.

45.     The investigation began in December 2019 and was finally concluded on November 13, 2020—over 11 months after the initial report by Jane Doe. The following is a timeline of the events in the aftermath of Walter McCarty's assault on Jane Doe:

- *December 12, 2019*. Jane Doe has to attend practice and see McCarty face to face for the first time since he assaulted her. Ms. Doe makes an appointment with University counselor. Ms. Doe then submits her initial report online and blocks McCarty on all social media.

- *December 13, 2019*. The University sends a Title IX directive letter to McCarty prohibiting him from communicating with any potential witness or anyone he "interacted with that may be viewed as a policy violation that may be viewed as retaliation."

- *December 17, 2019*. Annie Sills contacts Jane Doe via email and text regarding the Title IX report. Jane Doe has to attend practice and treatments with basketball team.

- *December 21, 2019*. Jane Doe attends men's basketball game between the University of Evansville and Murray State at Ford Center.

- *December 23, 2019*. The University sends a Title IX directive letter to McCarty "to have no contact with [Jane Doe] in any way, including in person, through non-verbal communication such as hand gestures or eye contact/staring, through hand-written or typed notes, by telephone, email, text message or other electronic means of communication, or through a third-party such as a mutual friend, acquaintance, or using another person's phone or electronic device."

- *December 26, 2019*. Formal notice of investigation is delivered to McCarty. McCarty is placed on administrative leave. The same day, the University issues another Title IX directive reminding him that the December 23, 2019 Directive Letter remained in effect.

- *December 27, 2019*. The University releases a statement that they are placing McCarty on leave for Title IX violations and admits receiving numerous reports of McCarty's Title IX violations and misconduct. McCarty calls Spencer later that evening.  Spencer apologetically explains to McCarty that because of McCarty's pattern of misconduct and because of the current climate of the "#MeToo" era that they cannot just put the allegations aside and let him resign.

- *January 9, 2020*. The University issues a directive to McCarty to have no contact with any employee of the University except Spencer.

- *January 15, 2020*.  Head coach of another University sports team reports that McCarty contacted him on January 14, 2020 and requested an in-person meeting at the parking lot of a local restaurant. During the meeting, McCarty reportedly told the coach to tell a member of the team, a friend of Jane Doe's at the time, and a named witness in the investigation—that if she and Jane Doe failed to tell the investigators the truth, they would end up in jail for lying.

- *January 21, 2020*.  The University releases a public statement that Walter McCarty has been fired as the head men's basketball coach.

- *February 14, 2020*. Michael Smith, the University's Chief Information Officer examines McCarty's computer and identifies data had been deleted from McCarty's laptop and University-owned email wm97@evansville.edu.  Smith determined that the emails were deleted and purged from McCarty's inbox on or after December 13, 2019.

- *March 7, 2020 through August 31, 2020*. Despite concerns triggered by the global COVID pandemic, the University continually refuses Doe's and Ms. Tuegel's numerous attempts to review the Preliminary Investigation Report remotely, insisting that Doe or Ms. Tuegel could only view it in-person, thereby delaying the review and investigation process for over five months.

- ***March 17, 2020***. McCarty sends Jane Doe's mother a follow request and direct message on Instagram, including a "dark" photo that states "Lying won't erase the truth it can only delay its discovery!" with the word "Lying" in red. Jane Doe's mother took the message as a threat. Jane Doe's mother notifies Ms. Tuegel and they notify the University.

- ***July 2, 2020***. The University appoints an external adjudicator to issue a final decision in the Title IX investigation on behalf of the University.

- ***November 14, 2020***. The external adjudicator finally releases its final adjudication.

**F.      The University investigation concludes that the evidence shows McCarty sexually harassed and sexually assaulted Jane Doe and that after she reported the violations to the Title IX office, McCarty retaliated against her.**

46.      Finding that, together with the parties' actions after the incident, the "documentary evidence supports [Jane Doe]'s version of events"—and belies McCarty's version—the investigation determined that "it is more likely than not that the incident occurred as [Jane Doe] alleged." Accordingly, the Final Adjudication concluded that:

a.      First, McCarty had non-consensual sexual contact and sexual intercourse with Jane Doe that constituted sexual assault. Although McCarty says he believes the sexual contact and intercourse were consensual, University's Sexual Harassment and Misconduct Policy (the "Policy") on Title IX issues states the following regarding "consent":

**Consent** requires a voluntary, informed and freely-given agreement, communicated though mutually-understandable words and/or actions, to engage in agreed-upon Sexual Contact, Sexual Intercourse, Sexual Exploitation, or other sexual activity. . . .

In evaluating whether **Consent** has been freely sought and given, the University will consider the presence of any force, threat of force, or coercion; whether the Complainant had the capacity to give consent; and whether the communication (through words and/or actions) between the parties would be interpreted by a reasonable person (under similar circumstances and with similar identities) as a willingness to engage in a particular sexual act.

Important considerations regarding **Consent** include:

- Consent to one form of sexual activity does not imply or constitute consent to another form of sexual activity.

- Consent on a prior occasion does not constitute consent on a subsequent occasion.

- Consent to an act with one person does not constitute consent to an act with any other person.

- The existence of a prior or current relationship does not, in itself, constitute consent' even in the context of a relationship, there must be real time and mutual consent to sexual activity.

- Consent can be withdrawn or modified at any time, and sexual contact must cease immediately once Consent is withdrawn.

- Consent cannot be inferred from the absence of a "no."

- Consent cannot be inferred from silence, passivity, or lack of verbal or physical resistance, and relying on nonverbal communication alone may result in a violation of this Policy.

Based on an assessment of the totality of the circumstances, the investigation concluded that "[t]he sexual intercourse and sexual contact—which are the sexual activities [McCarty] admitted he engaged in—was all without [Jane Doe's] consent and, therefore, prohibited conduct under the Policy." Despite McCarty's denials, the report found "there is more than a preponderance of evidence, just based on [Jane Doe]'s statements, her post-incident actions, the documentary

evidence she provided and the corroborating statements from several witnesses, to determine that it is more likely than not that the incident occurred as [Jane Doe] alleged";

      b.     McCarty's sexual advances toward and communications with Jane Doe were sexual harassment. The Policy also defines sexual harassment as "any unwelcome sexual advance." The investigation found that Jane Doe's documentary evidence and responses were credible and, "individually and collectively, support a finding that [McCarty's] sexual advances were unwelcome." Ultimately, the investigation found that McCarty also "engaged in Sexual Harassment when he continued to send [Jane Doe] unwelcome sexual advances between December 10–12, 2019," when McCarty continued messaging Jane Doe "trying to get her to reengage with him" until she blocked him; and

      c.     McCarty committed retaliation against Jane Doe after she reported the assault. Under the Policy, "retaliation" occurs when a person says or does something against an individual or group that reports or complains of a Policy violation. Such retaliatory acts may include "adverse action" or "threats and intimidation that would discourage a reasonable person (under similar circumstances and with similar identities to the targeted individual or group) from" reporting the Policy violation. The investigation determined that "there is ample credible evidence, under the preponderance standard, that [McCarty] engaged in two acts of Retaliation: on January 14, 2020, when he contacted Coach Mundell in a targeted attempt to get a message to [Jane Doe] and her friend; and, on March 17, 2020, when he contacted [Jane Doe]'s mother in, again, a targeted attempt to get a message to [Jane Doe] through her mother, both attempts designed to harass, threaten and intimidate a party and/or witnesses."

      **G.**     **The investigation concludes that that McCarty's assault on Jane Doe violated the University's policies and breached McCarty's employment agreements.**

47.     The Final Adjudication concluded that McCarty's conduct toward Jane Doe violated numerous University policies and breached McCarty's employment agreements.

48.     Specifically, the Final Adjudication determined McCarty violated the University's:

a.      *Sexual Harassment & Misconduct Policy*, both by sexually assaulting Jane Doe through sexual contact and sexual intercourse without her consent and by sexually harassing her through unwelcome sexual advances and communications (but not the *Consensual Sexual Relationships Policy*, which the Final Adjudication found did not apply since the sexual contact and relationship between McCarty and Doe were not consensual);

b.      *Employee Code of Conduct*, by failing to comply with provisions on: (1) commitment to integrity and ethical conduct, (2) compliance with laws and University policies, and (3) harassment and related laws and regulations; and

c.      *Administrative Manual* by participating in "discrimination in the form of sexual harassment" and unacceptable employee behavior, including "immoral or indecent conduct," "obscene, abusive, or harassing language or behavior," harassment (including sexual) directed toward a student, "failure to cooperate in investigations of . . . harassment," and acts contrary to the reputation or best interests of the University, including those occurring outside the workplace.

49.     Likewise, the Final Adjudication found McCarty materially breached his *Administrative Employment Contract and Employment Agreement* with the University "by violating the University's *Sexual Harassment and Misconduct Policy*, and specifically, by engaging in Sexual Assault, Sexual Harassment, Retaliation and Violation of University Directives."

50.     The University's failure to enforce—and follow—its own policies shows its indifference to the ongoing threat McCarty posed the women of the Evansville community. The result of these failures was that McCarty went on to harass and assault numerous women who attended or worked for the University on a persistent basis.

## IV.
## CAUSES OF ACTION

### COUNT 1
### DISCRIMINATION UNDER TITLE IX: SEXUALLY HOSTILE CULTURE AND DELIBERATE INDIFFERENCE
### (Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a))

51.     Plaintiff realleges and incorporates by reference all facts and allegations set forth in the preceding paragraphs.

52.     McCarty's verbal and physical sexual advances toward—and sexual assault of—Jane Doe were not welcome and constitute sexual harassment under Title IX.

53.     Jane Doe and other complainants who reported McCarty's sexual misconduct told an "appropriate person" about their harassment and assaults. It is undisputed that numerous women informed University officials of McCarty's sexual misconduct toward the women before Jane Doe informed the University officials, including without limitation Title IX Coordinator Annie Sills, about McCarty's sexual assault of Jane Doe. Sills—along with others who certainly were aware of what the other complainants reported McCarty did to them and of the sexual harassment and assault Jane Doe reported to her—had authority to take corrective action to end the discrimination.

54.     University officials—including those in the Title IX Office, the Office of Institutional Equity, and the Athletic Department where McCarty worked—actually knew of McCarty's demonstrated penchant for sexual misconduct and the risk he posed to female students and employees of the University before he harassed and assaulted Jane Doe.

55.     The University was on notice and aware of at least seven other female students and employees of the University, and of other women in the community, who were sexually harassed by McCarty.

56.     After issuing warnings to McCarty about the first few incidents, the University deliberately chose not to take any further action regarding McCarty's continual sexual harassment of women, to investigate the additional incidents, or to protect the women on campus from McCarty's sexual harassment and assault. Such failures were clearly unreasonable.

57.     The University's deliberate indifference is evident from both the University's failure to take any meaningful action to address Walter McCarty's sexual misconduct toward women at the University and from its failure to enforce its own policies that McCarty violated.

58.     First, University officials admittedly had notice of McCarty's pattern of sexual harassment and assault but made an affirmative decision to take no further action, while at the same time giving the illusion that they were reporting the sexual assault and responding in an appropriate manner. Given McCarty's extensive pattern of harassment, the University's limited investigations and warnings given to McCarty following prior incidents—without taking any action to implement any protective measures—amounted to deliberate indifference.

59.     Second, McCarty's conduct toward Jane Doe and the other women who reported his unwelcome sexual advances to the University violated the University's:

a.     *Sexual Harassment & Misconduct Policy*, both by sexually assaulting Jane Doe and others through sexual contact and sexual intercourse without her consent and by sexually harassing these women through unwelcome sexual advances and communications;

b. *Employee Code of Conduct*, by failing to comply with provisions on: (1) commitment to integrity and ethical conduct, (2) compliance with laws and University policies, and (3) harassment and related laws and regulations; and

c. *Administrative Manual* by participating in "discrimination in the form of sexual harassment" and unacceptable employee behavior, including "immoral or indecent conduct," "obscene, abusive, or harassing language or behavior," harassment (including sexual) directed toward a student, "failure to cooperate in investigations of . . . harassment," and acts contrary to the reputation or best interests of the University, including those occurring outside the workplace.

60. Furthermore, by sexually harassing and assaulting students and employees of the University and women in the Evansville community—violations of the University's *Sexual Harassment and Misconduct Policy* and the *Administrative Manual*—McCarty materially breached his *Administrative Employment Contract and Employment Agreement* with the University.

61. The University's failure to enforce and follow its own policies is further evidence of its indifference. The result of these failures was that McCarty went on to harass and assault numerous women who attended or worked for the University on a persistent basis.

62. The University's deliberate indifference to McCarty's ongoing sexual harassment exposed Plaintiff to continued sexual harassment—and sexual assault—which was so severe, pervasive, and objectively offensive that it effectively barred her access to meaningful educational opportunities and benefits including academics, athletic programs, and on-campus events and activities.

63.     As a direct and proximate result of the University's deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which the University is liable.

### COUNT 2
### RETALIATION AS DISCRIMINATION UNDER TITLE IX
### (Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a))

64.     Plaintiff realleges and incorporates by reference all facts and allegations set forth in the preceding paragraphs.

65.     Jane Doe made a good faith complaint alleging sex discrimination.

66.     McCarty retaliated against Jane Doe because she complained of sex discrimination. As the investigation here concluded, McCarty engaged in two acts of Retaliation: on January 14, 2020, when he contacted Coach Mundell in a targeted attempt to tell Jane Doe that she would "go to jail for not telling the truth"; and, on March 17, 2020, when he contacted Jane Doe's mother, saying: "Lying won't erase the truth, it can only delay its discovery." The investigation found "both attempts [were] designed to harass, threaten and intimidate a party and/or witnesses." Consistent with the Supreme Court's guidance, McCarty's retaliations are also Title IX violations.

67.     McCarty's retaliation against Jane Doe constitutes intentional discrimination on the basis of sex, in violation of Title IX.

68.     The retaliation against Jane Doe continued her exposure to sexual harassment that was so severe, pervasive, and objectively offensive that it effectively barred her access to meaningful educational opportunities and benefits including academics, athletic programs, and on-campus events and activities.

69.     As a direct and proximate result of the University's deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which the University is liable.

### COUNT 3
### NEGLIGENCE & GROSS NEGLIGENCE UNDER INDIANA STATE LAW

70.     Plaintiff realleges and incorporates by reference all facts and allegations set forth in the preceding paragraphs.

71.     The University owed a duty of reasonable care and supervision to its student Jane Doe.

72.     Jane Doe was not only a student but was also working as a subordinate to McCarty when he sexually harassed and assaulted her. Even after the assault, McCarty continued sending Jane Doe inappropriate messages in which he made comments about her body. McCarty also made comments about Jane Doe's body publicly in front of fellow students and colleagues in the Athletic Department. In carrying out her role as an athletic trainer, Jane Doe then had to see McCarty for weeks at basketball games and practices, even though the basketball gym was "the last place [she] wanted to be." McCarty remained on campus as Jane Doe's superior until December 26, 2019.

73.     For over a year and half before the incidents involving Jane Doe, people had expressed concerns to University officials about McCarty's sexual harassment or assault of at least seven women in the Evansville community, including students and employees of the University. Likewise, the University had policies authorizing it to investigate McCarty's inappropriate sexual contact with the women he victimized and harassed. Indeed, Athletic Director Mark Spencer confirmed that even if there had not been such a well-documented pattern of sexual misconduct and impropriety as there was in this case, even one instance of sexual harassment or assault of a student would have warranted terminating McCarty. Instead, there were seven from June 2018

through December 11, 2019. Yet McCarty was permitted to work with students until after Jane Doe filed a complaint against him and the University initiated an official Title IX investigation.

74.     In light of its substantial notice of McCarty's misconduct, the University should have reasonably foreseen and anticipated McCarty's harassment and assault of Jane Doe.

75.     But rather than terminate, supervise, or otherwise monitor McCarty for his predatory behavior toward women, the University allowed McCarty to continue and placed him in the Evansville community, bolstering his positive reputation to the benefit of the University.

76.     The University, thus, breached its well-established duty to Doe when it failed to investigate numerous complaints it had received about Walter McCarty's sexual misconduct.

McCarty committed a civil assault on Jane Doe when he made intentional sexual advances on her, placing Doe in apprehension of imminent harmful or offensive contact. McCarty's conduct went beyond creating apprehension when he made offensive sexual contact with Jane Doe. The offensive contact perpetrated on Jane Doe—made without her consent—included sexual contact and sexual intercourse.  Such offensive sexual contact is a civil battery under Indiana state law.

77.     The University also breached its duty to Doe when it failed to take any action against McCarty other than advisory action when University officials learned that multiple women who were students and employees of the University made allegations of sexual misconduct against McCarty.

78.     The University also breached its duty to Doe when it failed to implement its own policies and procedures that McCarty violated and that allowed the University to take corrective measures, including terminating McCarty, which would have prevented the sexual assault he perpetrated against Jane Doe.

79.     The University could have taken action against McCarty, but instead it did nothing to stop McCarty from sexually harassing, and ultimately assaulting, young female students and employees of the University and other women in the Evansville community.

80.     The University acted willfully and wantonly violated its duties to Jane Doe and thereby engaged in grossly negligent behavior. It was well known to them that sexual abuse was likely to occur and that Jane Doe would be sexually abused and assaulted.

81.     Because of the University's multiple breaches of duty, Jane Doe was sexually harassed and assaulted by the University's employee Walter McCarty. By the time Doe reported her assault to the University on December 12, 2019, two high-ranking University officials had raised additional concerns on December 11, 2019 about McCarty's misconduct toward other women in the Evansville community and his harassment of a female student at the University.  The University's negligence and gross negligence directly caused Jane Doe's sexual harassment and assault.

82.     The University's wholesale failure to take any real action to prevent McCarty from victimizing female students and employees of the University after either the first, second, third, fourth, fifth, sixth, or seventh sexual incident raises the inference that McCarty's acts were authorized by the University.

83.     Furthermore, McCarty's sexual assault of Jane Doe happened while McCarty was acting in his role as Jane Doe's superior on the men's basketball team.

84.     As a direct and proximate result McCarty's assault and battery and of the University's actions and inaction, Plaintiff suffered damages and injuries for which the University is directly liable.

85.     As a direct and proximate result of the University's negligent infliction of emotional distress, Plaintiff suffered damages and injuries for which the University is directly liable.

86.     As a direct and proximate result of McCarty's battery, Plaintiff suffered damages and injuries for which the University is vicariously liable.

## V.
## ATTORNEYS FEES

87.     As a result of this action, Plaintiff has retained Michelle Simpson Tuegel and Jeff Gibson to represent her in her claims against Evansville. Accordingly, Plaintiff seeks attorneys' fees incurred pursuant to Title IX.

## VI.
## JURY DEMAND

88.     Plaintiff respectfully demands a jury trial in this matter.

## VII.
## RELIEF REQUESTED

89.     For the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment against Defendant consistent with the relief requested herein, and for any and all other relief to which Plaintiff may be justly entitled including actual damages, compensatory damages, court costs, attorneys' fees, and pre- and post-judgment interest.

Wherefore, Plaintiffs respectfully request that this Court will:

a.     Enter judgment against Defendant in such amounts as willfully and adequately compensate Plaintiff for the damages she has suffered in amount to be determined at trial,

b.     Award Plaintiff punitive damages against Defendant in an amount to be determined by a jury for Defendant's violations of the law,

c.      Award Plaintiff pre-judgment and post-judgment interest;

d.      Award Plaintiff her actual expenses of litigation, including reasonable attorney's fees.

e.      Award Plaintiff such other and further relief as this Court deems just and proper.

DATED: April 12, 2021

Respectfully submitted,

By: */s/      Michelle Simpson Tuegel*

**Michelle Simpson Tuegel**
**THE SIMPSON TUEGEL LAW FIRM, PLLC**
*Admitted*
3301 Elm St.
Dallas, Texas 75226
Tel: 214-774-9121
Fax: 214-939-9229
michelle@stfirm.com

/s/ Jeff Gibson
**Jeff Gibson**
**WAGNER REESE, LLP**
*Admitted*
Bar No. 22362-49
11939 N. Meridian Street,
Suite 100 Carmel, IN 46032

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was served via the Court's ECF electronic filing system on this 12th day of April 2021, and via email and U.S. Mail to Counsel for Defendants.

Hayley E. Hanson
4801 Main Street, Suite 1000
Kansas City, MO 64112
Direct: 816.983.8377
Fax: 816.983.8080
<u>hayley.hanson@huschblackwell.com</u>
Attorney for Defendant, University of Evansville

*/s/Michelle Simpson Tuegel*
**THE SIMPSON TUEGEL LAW FIRM, PLLC**
*Admitted*
3301 Elm St.
Dallas, Texas 75226
Tel: 214-774-9121
Fax: 214-939-9229
michelle@stfirm.com

/s/ Jeff Gibson
**Jeff Gibson**
**WAGNER REESE, LLP**
Bar No. 22362-49
11939 N. Meridian Street,
Suite 100 Carmel, IN 46032

**ATTORNEYS FOR PLAINTIFF**